529 A.2d 1137

Philadelphia Electric Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources and Neshaminy Water Resources Authority, Respondents.

North Penn Water Authority and North Wales Water Authority, Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, and Neshaminy Water Resources Authority, Respondents.

8

Heard July 2, 7, 9, 10, 1987, before President Judge CRUMLISH, JR.

*Bernard Chanin,* with him, *Jeffrey S. Saltz, Pamela S. Goodwin* and *Michael M. Meloy, Wolf, Block, Schorr and Solis-Cohen,* and *Robert W. Valimont, Power,*

*Bowen* & *Valimont,* for petitioner, Philadelphia Electric Company.

*Jeremiah J. Cardamone,* with him, *Ann Thornburg Weiss* and *Catharine M. Roseberry, Timoney, Knox, Hasson* & *Weand,* for petitioners, North Penn Water Authority and North Wales Water Authority.

*Louise S. Thompson,* Assistant Counsel, with her, *Dennis W. Strain,* Assistant Counsel, for respondent, Commonwealth of Pennsylvania, Department of Environmental Resources.

*Fred T. Magaziner,* with him, *Gordon W. Gerber, Lois Reznick* and *George G. O'Brien, Dechert, Price* & *Rhoads,* for respondent, Neshaminy Water Resources Authority.

*Richard M. Rosenbleeth,* with him, *William E. Taylor, III,* and *Glenn S. Gitomer, Blank, Rome, Comisky* & *McCauley;* Of Counsel: *James M. McNamara,* County Solicitor, for intervenor, County of Bucks.

*Robert J. Sugarman,* with him, *Walter W. Cohen, Sugarman* & *Cohen,* for intervenor, Del-Aware Unlimited and Charles Yarmark, et al.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., July 21, 1987:

Before this Court is another action in the continuing series of legal contests between those in favor of and those opposed to the Point Pleasant Water Diversion Project, commonly known as the Delaware River "Pump project."

Herein, the Philadelphia Electric Company and North Penn and North Wales Water Authorities (peti-

tioners) have filed petitions for review in our original jurisdiction 42 Pa. C. S. §761 and applications for prohibitory, injunctive relief seeking to enjoin the Commonwealth Department of Environmental Resources (DER) from suspending construction on certain portions of the project which were previously permitted by DER.[1] North Penn and North Wales also seek a writ of mandamus to compel DER to transfer to them portions of those permits previously held by the Neshaminy Water Resources Authority (NWRA), as directed by the Bucks County Common Pleas Court order of February 24, 1985. DER and NWRA have filed preliminary objections to these petitions. Del-Aware Unlimited, Inc., and Bucks County request leave to intervene and have filed motion to dismiss petitioners' petition.[2]

The factual background of this litigation is painfully familiar and does not warrant detailed recitation at this time. Suffice it to say that, on June 26, 1987, in response to the petitioners' requests for extensions on water allocation and stream encroachment permits[3] for

---

[1] The allocation permit, No. 0978601, authorized the intake of water from the Delaware River at Point Pleasant and from the North Branch Neshaminy Creek and Pine Run in Bucks County. The encroachment permits, Nos. Enc. 09-51, Enc. 09-77 and Enc. 09-81 authorize construction on water flow structures on the North Branch Neshaminy Creek, the East Branch Perkiomen Creek, and under and across various streams in Plumstead and Bedminster Townships.

[2] Del-Aware and Bucks County's requests to intervene were granted orally by this Chancellor in court. N.T. 7/2/87 pp. 4 and 140. DER's Motions for protective orders as to various documents and as to the testimony of John Carroll, Esquire, former chief counsel to DER, were also disposed of during the proceedings. The respective motions to dismiss petitioners' applications, made in Court at the conclusion of petitioners' presentation of evidence, are hereby denied.

[3] Encroachment is defined in the act as "[a]ny structure or activity which in any manner changes, expands or diminishes the

components of the diversion project, DER issued four letters extending those permits until December 31, 1987. However, DER reasserted its rights to revoke or suspend in the future and, in the case of encroachment permits, it ordered that "no further construction of facilities approved under th[e] permit[s] [are] authorized, during the period of this extension."

Although water allocation and encroachment permits had been extended several times since they were originally granted (the water allocation permit was issued in 1978; the encroachment permits in 1982), never before had there been conditions imposed prohibiting construction. DER, under the guidance of its newly-appointed secretary, sua sponte ordered this halt to construction, having decided to review and re-evaluate the entire project.

In support of the preliminary objections, DER, NWRA and Bucks County argue that jurisdiction over this matter is in the Commonwealth Environmental Hearing Board (EHB) and not this Court, because petitioners have failed to exhaust their administrative remedies—specifically, they did not appeal DER's decision to that body.

Petitioners argue that Deputy Secretary James Grace, author of the permit extension letters, lacked authority or at least exceeded it by prohibiting construction as a condition of extending the permits, since construction was properly authorized at their issuance. Thus, the gravamen of the petitioners' complaints is a challenge to the scope of the Deputy Secretary's legal authority, as delegated from the Secretary, to restrict the permit extensions.

Petitioners seek a prohibitive writ to restrain DER, in its adjudicatory function, from exceeding its es-

course, current or cross-section of any watercourse, floodway or body of water." 32 P.S. §693.3.

tablished limits in the exercise of its jurisdiction. Such writs lie when an inferior tribunal either has no jurisdiction or exceeds its jurisdiction and are within the discretion of an appellate court, *Capitol Cities Media v. Toole*, 506 Pa. 12, 483 A.2d 1339 (1984). They will not lie unless there is a clear usurpation of power by the inferior tribunal and a lack of adequate alternate remedy. *Yellow Cab Owners and Drivers Association v. Pennsylvania Public Utility Commission,* 87 Pa. Commonwealth Ct. 626, 488 A.2d 369 (1985).

Petitioners contend that, due to the unique factual posture of this matter, the adequacy of administrative relief is unlikely if not non-existent. We agree. Construction on this multi-million dollar project has been halted for more than three weeks because of DER's action. Noting the history of righteous litigation which encompasses this project and undeniable seasonal bureaucratic delays, and even assuming that the EHB would act promptly on a stay, the construction ban could continue well beyond this construction season because of further legal maneuvers. This Court cannot countenance procedural delays which would, under the guise of administrative review, have the same practical effect of allowing a government official to take steps which otherwise may not be within his authority. *See Arsenal Coal Co. v. Department of Environmental Resources,* 505 Pa. 198, 477 A.2d 1333 (1984) (equity jurisdiction properly invoked for pre-enforcement review of agency regulation when harm shown is "immediate and direct"). *See also Lindy Homes v. Sabatini,* 499 Pa. 478, 453 A.2d 972 (1982) (disallowing equitable action in mandamus in favor of protracted administrative appeals, where entitlement to permits is *clear,* would unduly burden permittee with an inadequate and inefficient remedy while facilitating abuse of licensing power). The evidence petitioners presented as to attendant shortfalls

in water supplies, which this Chancellor accepts as valid, leads us to conclude that they would suffer substantial irreparable harm if judicial inaction were to allow it.[4]

Moreover, petitioners have raised substantial constitutional challenges[5] to DER's permitting actions which warrant equitable intervention. *Young J. Lee, Inc. v. Department of Revenue*, 504 Pa. 367, 474 A.2d 266 (1983).

Thus we have concluded that the present status of the "pump project," as it is now known to every reader, viewer and divergent environmental expert in the Delaware Valley, calls for an inspection and resolution of appropriate equitable principles.

While the usual and carefully preserved constaints this Court meticulously imposes upon itself are at risk, this Chancellor is compelled to reflect upon the historic

---

[4] Mr. S. J. Kowalski, PECO vice president of engineering and research, testified that needed cooling waters for the Limerick I generating station are expected to flow in August of 1988 and that Limerick's water needs were now being supplied by interim sources operating through temporary variances. A "pushback" of the construction schedule now will mean that Point Pleasant will not be operational as scheduled and not until after the temporary variances for other water sources have expired. Such a situation would force a shutdown of Limerick.

Mr. Stephen F. Talian, a consulting engineer to North Penn and North Wales, testified to a water deficiency in those authorities of up to five million gallons per day and to the necessity of present and past water restrictions, as well as to projected increases in demand based on his and other studies. He also testified that 3,000 pending housing unit applications are being withheld as a result of the service ban on new connections imposed by North Penn and North Wales.

[5] Petitioners asserted due process violations in that they were deprived of a property right without notice and a predetermination opportunity to be heard; and that the Secretary's action represents a taking without compensation.

controversy which brings this action before him today. It is particularly compelling in light of the need to examine the equities involved.

A simple equation of the rights of the few and the rights of the many may serve as a stepstone. That there are present before us in Court advocates asserting private or special interests—political or economic or both—should not obscure the genuine interest of individuals, faceless and vocally remote, who are not "named parties" to this action.

This Chancellor believes it his duty as he presides in equitable disputes to look beyond the corporate, private or political interests and to recognize and accommodate the needs of those who otherwise would have no voice in this hall of chancery. Within this larger framework constitutional and statutory requirements must be recognized and applied.

To this end, our first inquiry is to determine whether the Secretary exceeded the scope of his authority in banning all construction as a condition of extending the four permits in question.

Sections 7 and 8 of the Act of June 24, 1939, P.L. 842, *as amended,* govern the issuance of water allocation permits. Section 7 provides that DER "shall have the power to issue, modify or impose conditions in permits or confirmed claims for, or to the acquisition of, water rights theretofore or thereupon issued when *deemed necessary . . .* and *. . . as the public interest shall require."* 32 P.S. §637. Section 8 of the Act authorizes DER "to grant such extensions of said period as the [Department] *deems necessary to enable the permittee to complete the project* required for the taking of water." 32 P.S. §638 (emphasis added).

Similarly, Section 9 of the Dam Safety and Encroachments Act authorizes DER to grant encroachment permits if "the proposed project complies with

the provisions of this act and the regulations adopted hereunder, and complies with all other applicable laws. . . ." 32 P.S. §693.9(a).. It further provides that "[t]he department may impose such permit terms . . . as are necessary to assure compliance with this act and other laws. . . ." 32 P.S. §693.9(b).

The encroachment permits issued herein recite that they may be modified, suspended or revoked if the permittee's application information proved to be false, incomplete or inaccurate and that the Department may *suspend or revoke* them if it is in the best interest of the Commonwealth. PECO Exhibits 9, 10, 11, paragraphs 3, 4. Thus, in examining the pertinent statutes and permits under review here, and construing them to be consistent with each other, it is clear that the Secretary must establish necessary and valid reasons for his actions.

Referring to the extension requests for all four permits, James Grace, Deputy Secretary for Resources Management, responded in four separate letters on June 26, 1987. In those letters, Deputy Secretary Grace provided the following explanation for conditioning the extensions on a halt to construction:

> The Department has determined it is necessary and appropriate to reevaluate aspects of this permit and the Point Pleasant Diversion Project as a whole. Recent realignments of rights and duties for the public water supply portions of the project made by the county court, combined with evidence of changes in projected needs and demands have the potential for affecting the Department's assessment on that portion of the project.

PECO Exhibit A.

We agree with DER that the Secretary and his deputies have broad discretion to impose conditions on the

issuance of these permits. However, there has not been a showing that the legal standards for modifying these permits have been met. This failure is particularly telling in light of the original permit grant, the litigation and appeals which ensued *and the repeated extensions of these permits, without a construction ban,* upon findings of good cause over the years since they were originally issued.

In his letters, Deputy Secretary Grace proffered two reasons for the imposition of a construction ban. First, as to the "realignment of rights and duties made by the County Court," this Chancellor is unable to see how the Bucks County Common Pleas Court orders, as affirmed by the Commonwealth's appellate courts,[6] requiring, *inter alia,* the parties to "take all necessary steps to award and enforce construction contracts and commence construction" mandates a cessation of construction. The court-ordered transfer of certain portions of the project (and concomitant permits) from NWRA to North Penn and North Wales should not impact on DER's duty to review and ascertain the environmental effects of this project.

---

[6] In February of 1985 Bucks County Common Pleas Court ordered performance of construction contracts. This Court affirmed that order in *Sullivan v. County of Bucks,* 92 Pa. Commonwealth Ct. 213, 499 A.2d 678 (1985). The Supreme Court denied petitions for allowance of appeals of our decision on May 8, 1986, at No. 1293 E.D. Appeal Docket 1985 and June 6, 1986, at No. 1267 E.D. Appeal Docket 1985.

In response to PECO and North Penn and North Wales' petitions for supplemental relief, the Bucks County Common Pleas Court issued a supplemental order dated April 30, 1987, directing that all actions necessary for award of four construction contracts be taken, and a petition to lift supersedeas of that order was granted. This Court declined to order restoration of that supersedeas by Order of May 6, 1987. (No. 944 C.D. 1987 and No. 945 C.D. 1987). Construction of the Point Pleasant Pumping Station resumed in May 1987.

Second, the Secretary suggested to the permittees that evidence of changes in projected needs warranted prohibition of construction. Yet no empirical data was offered to those permittees when the prohibition was imposed, *and none was offered to this Court,* despite the opportunity to do so during the nearly three days of testimony heard by this Chancellor. Indeed, Secretary Davis conceded that the action he authorized in the June 26th letters was based merely on a speculation that a finding of good cause to suspend *might* be made sometime in the future:

PECO counsel. And that you did authorize the action that was taken in those letters?

Secretary. Yes, I did.

Q. Now, Secretary Davis, has a finding been made by DER with respect to those particular elements that you described as good cause? Has a finding been made that there is any danger to the public health by reason of this project, a finding?

. . . .

A. We didn't seek that kind of a finding.

Q. So you have not made such a finding, is that correct?

A. That public health is involved?

Q. That public health is endangered by this project.

A. Certainly looking at individual elements of it it would be difficult to make such a showing. The point I am trying to make is that looking down the road at the consequences of continuing these projects may or may not involve such a finding. . . .

N.T., 7/2/87, pp. 153-54.

The Secretary also testified that at his invitation, Mr. Pat McCarthy, who was not a member of his staff or

of the administration but who was a former member of the Governor's campaign staff, prepared a draft of an earlier (March 26) letter to NWRA and suggested for the first time the injection of the condition halting construction. N.T., 7/7/87, p. 203. In addition, Secretary Davis stated that he received the assistance, either directly or indirectly, of his own staff and the Governor's counsel staff in preparing his June response to the requests for permit extensions. N.T., 7/9/87, pp. 9-43.

We do not question the Secretary's discretion to seek advice and input on his decisions from sources inside and outside the government. However, it does suggest that motivation arising from political commitments was given inordinate consideration in the Secretary's decision. Suggestions from those outside the administration should not serve as the impetus for official action which adversely affects and diminishes the rights of the permittees. Such consultation, coupled with broad notions of policy considerations and the perceived need for reevaluation and review will not substitute for a required finding of statutory violation or threat to the public health or safety which would authorize permit modification.

The encroachment permits on their face authorize construction of certain pipeline and other water flow structures. Construction of these structures would be fruitless without the requisite water allocation permit. To impose a "condition" of no construction on these construction permits is to render them meaningless and amounts to a de facto revocation. Absent a finding supported by record evidence that the project does not comply with the Dam Safety and Encroachment Act and regulations promulgated thereunder, or that there is a need to assure compliance with other applicable statutes, the Secretary is without authority to impose permit terms, 32 P.S. §693.9(a), (b), especially those so onerous as to eviscerate their purpose.

Therefore, in order to preserve the status quo—which the Secretary repeatedly expressed a desire to do—and because the status quo prior to the June 26th letters was an extension of the permits and court-ordered resumption of construction, we will vacate those parts of the Secretary's permit extensions which prohibit construction.

With respect to North Penn and North Wales' application for mandamus to compel the transfer of portions of permits Enc. 09-81 and WAP 0978601, because this Chancellor believes that the right to the relief they seek is not clear we decline to grant their application for peremptory mandamus at this time.

Finally, it is the judgment of this Chancellor that this protracted litigation fostered by talented, skillful litigators, however well-intended, well-motivated and fervently articulated, must at some time and place be terminated. For it is clear that time runs in no one's favor so long as the rule of law prevails—and it most assuredly will.

The litigation now before us may be "squeezed dry," as Dickens put it, as this *"Jarndyce and Jarndyce* drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two chancery lawyers can talk about it for five minutes without coming to a total disagreement as to all the premises. . . . Scores of persons have deliriously found themselves made parties without knowing how or why; whole families have inherited legendary hatreds with the suit."[7]

Meanwhile, the fiscal losses heretofore incurred by the taxpayers and private interests alike will continue to rise and ultimately consume the protagonists and voiceless.

---

[7] Charles Dickens, Bleak House.

ORDER

Now, 21st day of July, 1987, upon consideration of petitioners Philadelphia Electric Company and North Penn and North Wales Water Authorities' Applications for Special Relief, and upon consideration of respondents preliminary objections thereto, and after hearing and consideration of briefs and memoranda of law in support thereof, it is hereby ordered:

1. The respective requests of Del-Aware Unlimited, Inc. and County of Bucks for leave to intervene in this matter are granted.

2. DER's motion for protective orders as to certain documents, submitted to the Court during the course of these proceedings, and as to the testimony of John Carroll, Esq. are granted in part and denied in part as indicated by the Court in the July 7 and 9, 1987 proceedings.

3. The respective motions of Del-Aware and NWRA, and County of Bucks to dismiss petitioners' applications for special relief are denied.

4. Petitioners' applications for special relief in the nature of prohibitory injunctive relief are granted. Those parts of Deputy Secretary James Grace's decisions, dated June 26, 1987, amending permits ENC. 09-77, ENC. 09-51 and ENC. 09-81 to prohibit construction of facilities approved thereunder are hereby vacated. Extension of said permits is hereby affirmed.

5. The additional application of North Penn and North Wales for relief in mandamus is hereby denied.

6. Stenographic costs of these proceedings shall be borne by the respondents.